IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| VALENCI'A QUEST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:04cv977-MHT |
| | ) | (WO) |
| ALABAMA HOUSE OF | ) | |
| REPRESENTATIVES, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

Plaintiff Valenci'a Quest, an African-American woman, filed this lawsuit against defendant Alabama House of Representatives (HR) charging that she was terminated in retaliation for complaining about a sexist and racist remark made by her supervisor and that her termination violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a, 2000e through 2000e-17. Jurisdiction is proper under 42 U.S.C. §§ 2000e-5(f)(3). This case is currently before the court on HR's motion for summary judgment.  For the reasons detailed below, that motion will be granted.

## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>see also</u> <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (discussing burden-shifting under Rule 56). The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials in the pleadings. Fed. R. Civ. P. 56(e).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II. FACTUAL BACKGROUND

In January 2000, Quest was hired for a part-time position at HR, and, in June 2001, was promoted to a full-time Data Operator I position.[1] HR employees are supervised by Greg Pappas, the clerk of HR. The clerk's administrative duties are divided into two areas: Administrative Assistant Don Ladner is responsible for

---

1. Plaintiff's Brief in Support of Denial of HR's Motion for Summary Judgment (Doc. No. 33) Exhibit 1, Affidavit of Valenci'a Quest, ¶ 2.

all billing matters, and Chief Clerk Vanna Norrell manages HR's day-to-day operations.[2] Quest's immediate supervisor was Mary Ward.

On December 5, 2002, while in the office Quest shared with Ruth Moore, Ward make a remark to Moore that Quest felt was both sexist and racist. The comment referred to an occasion in November or early December of 2002, when Representative James Thomas, an African-American, and several African-American female employees, including Quest, arrived at the Montgomery Airport after attending a conference. Thomas was surrounded by Quest and the other African-American women as he exited the plane. Ward stated to Moore that Thomas had a "harem."[3] The next day, Quest reported this remark to Norrell.[4]

---

2. HR's Evidentiary Submission in Support of its Motion for Summary Judgment (Doc. No. 29), Exhibit 4, Affidavit of Greg Pappas, ¶ 2.

3. Plaintiff's Brief in Support of Denial of HR's Motion for Summary Judgment (Doc. No. 33), Exhibit 1, Affidavit of Valenci'a Quest, ¶ 3.

4. Id. at ¶ 4.

On February 6, 2003, Quest met with State Representative Alvin Holmes, a legislator active in the area of civil rights, to discuss this comment. Representative Holmes assured her he would look into the matter.[5] The following day Ward requested that Quest meet with her and Ladner. Ward questioned Quest about why she met with Representative Holmes; she told Quest that she expects her employees to be loyal or to find work elsewhere. Ward also warned Quest that she had until the summer to complete Quest's evaluation, but that if it were due today, it would not be good.[6] Ladner then walked into Ward's office and told Quest that she should have limited her complaint to office management instead of going directly to a representative.[7] After this meeting, Ward and Ladner were cold to Quest in the office and spoke to her only when necessary. In August 2003, Ward

---

5. Id. at ¶¶ 5,6,7.

6. Id. at ¶¶ 8,9.

7. Id. at ¶ 10.

gave Quest a lower evaluation than the one Quest received the prior year.

On September 15, 2003, Quest reminded Ward that she had a doctor's appointment that day. Ward told her that, because a special session had been announced the night before, she could not leave. Quest then spoke with Norell who gave her permission to go to the doctor.[8] After waiting an hour-and-a-half at the doctor's office, Quest rescheduled her appointment for later that afternoon when the doctor's office was less busy. When she returned to HR, Ward asked for her resignation; Quest refused to resign.

A coworker told then Quest that Norell had instructed her to tell Quest that the head of security was going to collect Quest's personal items and place them in Norell's office.[9] Before returning to the doctor, Quest packed her personal belongings to avoid a confrontation with the

---

8.   Id. at ¶¶ 15, 16, 17.

9.   Id. at ¶ 21.

6

security officer, who supposedly had a reputation for letting his anger get out of control; Quest had witnessed a prior altercation between this officer and a former employee during which the employee was arrested and handcuffed.[10]

On September 16, 2003, Quest did not come to work. She called accounting and discovered that Ladner had removed her from the payroll.[11] She tried to speak with Ladner but he was out of the office. On September 17, Quest called Ladner again to inquire about her job status. She reiterated that she had not quit her job; Ladner responded that there were no jobs for her at the office.[12]

---

10. Id. at ¶ 22.

11. Id. at ¶ 24.

12. Id. at ¶ 26.

7

## III. DISCUSSION

To demonstrate a prima-facie case of retaliation Quest must show that: (1) she was engaged in statutorily protected activity under Title VII; (2) she suffered an adverse-employment action; and (3) there is a causal connection between the protected conduct and the adverse-employment action. Parris v. Miami Herald Publ'g Co., 216 F.3d 1298, 1301 (11th Cir. 2000). Quest's retaliatory termination claim is without merit because she cannot satisfy the first element of this three-part test. The court also has concerns about Quest's ability to establish the third element, but it need not reach this issue.

Quest argues that her complaints in December 2002 and February 2003 about Ward's 'harem' comment are statutorily protected activity under Title VII because she was reporting sexual and racial harassment. To be sure, one type of statutorily protected activity is "opposing any practice made an unlawful employment practice" under Title

VII. Lipphardt v. Durango SteakHR of Brandon, Inc., 267 F.3d 1183, 1187 (11th Cir. 2001) (citing 42 U.S.C. § 2000e-3(a)).  Notably, the complained-of employment practice need not be actually unlawful under Title VII; rather, the dispositive question is whether Quest can demonstrate "that she had a good faith, reasonable belief that [her] employer was engaged in [an] unlawful employment practice[]."  Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997).  Quest's belief that the harem comment was unlawful under Title VII must be both subjectively and objectively reasonable.  Put another way, Quest "must not only show that [s]he _subjectively_ (that is, in good faith) believed that [her] employer was engaged in [an] unlawful employment practice[], but also that [her] belief was _objectively_ reasonable in light of the facts and record presented."  Id. (emphasis original).

The court will assume that Quest has satisfied the subjective component of this two-part test.  Thus, the

critical inquiry is whether Quest's belief that a single remark, that she and other African-American females were part of a 'harem,' objectively could be viewed as rising to the level of sexual or racial harassment under Title VII. The objective reasonableness of Quest's belief "must be measured against existing substantive law." Clover v. Total System Services, Inc., 176 F.3d 1346, 1351 (11th Cir. 1999). "[F]ailure to charge the employee who opposes an employment practice with substantive knowledge of the law would eviscerate the objective component of our reasonableness inquiry." Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1388 n. 2 (11th Cir. 1998) (internal citation omitted).

Existing law is clear that Title VII is not "a general civility code." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998). Rather, to establish that an environment is sufficiently hostile to constitute harassment, it must be shown that, among other things, the harassment was unwelcomed, the harassment was based on a

protected characteristic, such as sex or race, and the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment. Walton v. Johnson & Johnson Servs., 347 F.3d 1272, 1279-1280 (11th Cir. 2003).

This court has not been provided nor has it uncovered any case law supporting a claim for sexual or racial harassment based on an isolated remark referring to a harem; instead, the courts addressing this fact pattern had found the use of the term harem, standing alone, to be insufficient to support such claims. See e.g., Shaw v. AutoZone, Inc., 180 F.3d 806, 813 n.3 (7th Cir. 1999)(a one-time labeling of an employee as being a part of a harem is "too innocuous to cause a reasonable person to believe that [her supervisor] was sexually harassing [her]); Summers v. University of Nevada, Las Vegas, 97 F.3d 1461, *11 (9th Cir. 1996) (unpublished) (one-time use of the word harem is a stray remark insufficient, by itself, to establish sex discrimination); Pospicil v.

Buying Office, Inc., 71 F. Supp. 2d 1346, 1357-58 (N.D. Ga. 1999)(noting that the use of the terms "whore" and harem", when viewed in light of other evidence, was sufficient to create a triable sexual harassment claim, but these comments alone would likely be insufficient to substantiate a claim); Elnashar v. Speedway SuperAmerica, LLC, 2005 U.S. Dist. LEXIS 23464,* 29 (D. Minn. Sept. 22, 2005) (an associate manager's comments about whether an Arab-American employee rode camels and had a harem were stray remarks and isolated incidents that do not rise to the level of actionable racial discrimination or harassment).[13]

This conclusion does not mean that the word harem can never support a racial or sexual harassment claim. It is

---

13. Although Quest is not Arab-American, the court cites this case because it was the only case the court discovered addressing the term harem as racially discriminatory. Because Quest has failed to explain how the term harem is racially discriminatory as to African-Americans and because of the dearth of case law supporting Quest's contention regarding the same, the court is satisfied that it is not objectively reasonable to believe that this term alone would establish a claim under Title VII for racial harassment.

clear that the word, even standing alone, can be derogatory; but the question here is whether the word can rise to the level of being so derogatory as to be harassment. The court agrees that, depending on the attending circumstances, the word harem, either at the time of usage or over a period of time or both, could possibly be so derogatory as to rise to the level of harassment, either sexual or racial. The problem here is that Quest has not provided such a context.

Finally, it appears that Quest's real concern is that she was terminated because she complained to a State Legislator. This concern raises more first amendment, rather than Title VII, issues, and the court does not have a first amendment claim before it at this time.

For the foregoing reasons, the court concludes that summary judgment should be granted on Quest's Title VII retaliation claim.

An appropriate judgment will be entered.

DONE, this the 24th day of May, 2006.

                                 /s/ Myron H. Thompson
                            UNITED STATES DISTRICT JUDGE